## IN THE UNITED STATES DISTRICT COURT FOR
## THE EASTERN DISTRICT OF TEXAS

STACY CURTIS, individually and on
behalf of the Estate of BILLY LEE ROSE,

      Plaintiff,

    vs.                                    **Civil Action No.: 6:25-cv-471**

WEST WHARTON COUNTY HOSPITAL
DISTRICT d/b/a UNIVERSITY PARK
NURSING & REHABILITATION; WICHITA FALLS
I ENTERPRISES, LLC; and CREATIVE SOLUTIONS
IN HEALTHCARE,

      Defendants.

## COMPLAINT

AND NOW, comes the Plaintiff, STACY CURTIS, on behalf of BILLY LEE ROSE, by and through his undersigned counsel, Constance Mutong, Esquire and Jacob Runyon, Esquire, and the law firm of Smith Clinesmith, LLP, and files this Complaint for Defendants' violation of duties imposed upon them under the Omnibus Budget Reconciliation Act of 1987 ("OBRA"); the Federal Nursing Home Reform Act ("FNHRA"); 42 U.S.C. §1396r, *et al.*; and the implementing regulations found at 42 C.F.R. §483, *et al.*, against Defendants WEST WHARTON COUNTY HOSPITAL DISTRICT d/b/a UNIVERSITY PARK, WICHITA FALLS I ENTERPRISES, LLC; and CREATIVE SOLUTIONS IN HEALTHCARE, hereinafter referred to as "Defendants".

### Nature of Action

1.      This is a proceeding under 42 U.S.C. §1983 to remedy deprivations of rights under the Omnibus Budget Reconciliation Act of 1987; the Federal Nursing Home Reform Act; the Federal Nursing Home Regulations as found at 42 C.F.R. §483, which amplify the aforementioned statutes.

**Jurisdiction and Venue**

2.      As the instant case presents issues of federal law, jurisdiction is proper in this forum as a federal question, pursuant to 28 U.S.C §1331.

3.      Venue lies within this judicial district, since all of the actions complained of herein occurred within the Eastern District of Texas.

**Parties**

4.      Plaintiff STACY CURTIS is an adult who resides at Wichita Falls, Texas.

5.      STACY CURTIS is the son of BILLY LEE ROSE.

6.      Plaintiff brings this action on behalf of BILLY LEE ROSE.

7.      BILLY LEE ROSE was born on May 14, 1953, and died on January 20, 2025, at the age of 71.

8.      Defendant West Wharton County Hospital District d/b/a University Park Nursing & Rehabilitation ("West Wharton County Hospital District") is a Hospital District organized under the laws of the State of Texas.

9.      Defendant West Wharton County Hospital District, as a governmental agency, at all times relevant hereto, was acting under the color of state law.

10.     Defendant West Wharton County Hospital District's principal place of business is located at 13906 FM 2710, Lindale, Texas 75771.

11.     Defendant West Wharton County Hospital District, in a governmental agency, can be served with process by serving the Texas Secretary of State, Service of Process – P.O. Box 12079, Austin, Texas 78711 as agent for services under Texas Civil Practice and Remedies Code § 17.044(a) because the Defendant does not maintain a designated agent of service of

process for Texas.

12.     Defendant Wichita Falls I Enterprises, LLC ("Wichita Falls I Enterprises") is a Texas limited liability company organized under the laws of the State of Texas.

13.     Defendant Wichita Falls I Enterprises operates, manages, and/or controls University Park Nursing & Rehabilitation.

14.     Defendant Wichita Falls I Enterprises' principal place of business is located at 4150 International Plaza, Suite 200, Fort Worth, Texas 76109

15.     Defendant Wichita Falls I Enterprises, LLC can be served via its statutory agent, Heather Gee, at 4150 International Plaza, Suite 200, Fort Worth, TX 76109.

16.     Defendant Creative Solutions in Healthcare ("Creative Solutions") is a business entity that owns, operates, manages, and/or controls University Park Nursing & Rehabilitation.

17.     Defendant Creative Solutions' principal place of business is located at 4150 International Plaza, Suite 200, Fort Worth, Texas 76109.

18.     Defendant Creative Solutions can be served via its statutory agent, Heather Gee, at 4150 International Plaza, Suite 200, Fort Worth, TX 76109.

19.     Defendant West Wharton County Hospital District is a county government organized and existing under the laws of the State of Texas. At all times relevant hereto, Defendant West Wharton County Hospital District, acting through University Park, was responsible for the policies, practices, supervision, implementation, and conduct of all matters pertaining to University Park and were responsible for the appointment, training, supervision, and conduct of all University Park personnel. In addition, at all relevant times, Defendant West Wharton County Hospital District was responsible for enforcing the rules of the University Park

facility and for ensuring that personnel employed in the facility obey the Constitution and laws of the United States and of the State of Texas.

20.    At all times relevant to this action, Defendants West Wharton County Hospital District, Wichita Falls I Enterprises, and Creative Solutions (collectively "Defendants") jointly and severally owned, operated, managed, supervised, and/or controlled University Park Nursing & Rehabilitation.

21.    At all times relevant hereto, Defendants operated University Park as a "skilled nursing facility," as that term is defined in 42 U.S.C. §1395i-3.

22.    At all times relevant to this action, Defendants were responsible for the care, treatment, and well-being of Mr. Rose while he was a resident at University Park Nursing & Rehabilitation.

23.    At all times relevant to this action, the agents, servants, employees, and personnel of Defendants were acting within the course and scope of their employment while providing care and treatment to Mr. Rose at University Park Nursing & Rehabilitation.

**<u>Statement of Claims</u>**

23.    All preceding paragraphs of this Complaint are incorporated herein, as if set more fully at length.

24.    From on or about July 21, 2024, until January 20, 2025, BILLY LEE ROSE was a resident at Defendants' skilled nursing facility, University Park.

25.    Prior to his admission to University Park Nursing & Rehabilitation, Mr. Rose resided at Courtyard Gardens, a long-term care facility in Wichita Falls, Texas. In July 2024, Courtyard Gardens closed its doors, requiring Mr. Rose and other residents to be relocated to

other facilities.

26.    Following the closure of Courtyard Gardens and after the death of his wife, Mr. Rose was unable to care for himself independently. The arrangements for Mr. Rose's transfer to University Park Nursing & Rehabilitation were made by Courtyard Gardens.

27.    At the time of his admission, Mr. Rose had multiple medical conditions documented in his medical records, including a history of cerebral infarction, transient ischemic attack, chronic systolic congestive heart failure, acute respiratory failure with hypercapnia, shortness of breath, schizophrenia, dementia, depression, anxiety, essential hypertension, bilateral artificial knee joints, osteoarthritis, sleep apnea, sideroblastic anemia, hyperlipidemia, and insomnia.

28.    Mr. Rose's admission assessment noted he required skilled nursing care for management of his multiple chronic medical conditions and assistance with activities of daily living.

29.    At the time of his admission, Mr. Rose's skin was intact.

30.    In or around September 2024, approximately one to two months after Mr. Rose's admission to University Park Nursing & Rehabilitation, Stacy Curtis visited her brother and observed that his legs were "fire red" and severely inflamed.

31.    Medical records from Mr. Rose's time at Courtyard Gardens document that he had a history of cellulitis in both legs that had previously required hospitalization, intravenous antibiotic treatment through a PICC line, and approximately two months of antibiotic therapy.

32.    Recognizing the seriousness of this condition based on his medical history, Ms. Curtis immediately notified the nursing staff that Mr. Rose needed to be evaluated by a doctor

for what appeared to be cellulitis.

33.     Over the course of several subsequent visits spanning multiple weeks, Ms. Curtis repeatedly requested that the nursing staff arrange for a physician to examine Mr. Rose's inflamed legs. Ms. Curtis escalated her concerns to the director of nurses, explicitly stating that Billy needed to see a doctor for his leg condition.

34.     Despite these repeated requests from Mr. Rose's family, during multiple visits over several weeks, Mr. Rose consistently informed Ms. Curtis that no doctor had come to examine his legs. Eventually, without conducting a proper physical examination of Mr. Rose or his inflamed legs, a physician prescribed a single bottle of antibiotics over the telephone.

35.     From October 11 through October 24, 2024, daily nursing notes documented active cellulitis in Mr. Rose's bilateral lower extremities with persistent tenderness, swelling, and redness. He was treated with a 10-day course of Doxycycline 100mg twice daily.

36.     On November 9, 2024, Mr. Rose complained of leg pain in both legs. On November 10, 2024, Mr. Rose complained of pain to both lower legs. On November 13, 2024, Mr. Rose complained of burning and tingling to his bilateral lower extremities. His physician prescribed Gabapentin for this neuropathic pain. On November 14, 2024, nursing staff documented that Mr. Rose had been experiencing pain frequently over the last five days, rated at 4.4 out of 10 intensity and described as moderate. Throughout November and December 2024, Mr. Rose repeatedly requested and received Tylenol for leg pain.

37.     On January 1, 2025, nursing records documented that Mr. Rose's bilateral feet and legs were "red, swollen, warm to touch and weeping." From January 2 through January 13, 2025, daily nursing notes documented active cellulitis in Mr. Rose's bilateral lower extremities being treated with Bactrim DS twice daily. The documented findings included tenderness to the

affected area, swelling to the affected area, increased warmth and heat to the affected area, redness to the area, serosanguineous drainage, and peeling, cracking, and scaling skin.

38.    On January 14, 2025, Mr. Rose complained of bilateral lower extremity pain. On January 18, 2025, Mr. Rose reported pain in his right and left lower leg and foot, describing it as dull, throbbing, and tingling.

39.    Medical records further document that Mr. Rose was frequently noted to be sitting in his wheelchair for extended periods with his feet dependent, which staff acknowledged was exacerbating the swelling in his legs.

40.    In mid-January 2025, Mr. Rose's condition deteriorated significantly. On January 16, 2025, Mr. Rose developed upper respiratory symptoms. He was coughing persistently and experiencing difficulty breathing. Medical records from January 16, 2025, document that Mr. Rose presented with symptoms of not getting air, shortness of breath, sore throat, dry cough, and fatigue, with oxygen saturation levels ranging from 84% to 90%. On January 16, 2025, a chest X-ray was performed which revealed cardiomegaly (enlarged heart) and probable left pleural effusion with left lower zone haziness. Despite these concerning findings, Mr. Rose was not transferred to a hospital for evaluation or treatment. A rapid influenza test performed on January 16, 2025, was negative for both Influenza A and Influenza B.

41.    During the final days of his life, Mr. Rose was so ill that he remained in bed for two to three consecutive days, which was highly unusual for him. Mr. Rose typically got up daily and used his wheelchair. His confinement to bed for multiple consecutive days represented a dramatic decline from his baseline functional status.

42.    On the night of January 19, 2025, Mr. Rose was conscious and acutely aware that he could not breathe. Mr. Rose told his roommate, James, that he could not breathe and that

he needed to go to the hospital. Because Mr. Rose could not reach his call light due to his weakened condition, his roommate James pressed his own call light to summon help for Mr. Rose.

43.     James explicitly informed the CNA that Mr. Rose was having trouble breathing and needed to go to the hospital. The CNA acknowledged this information and stated that she would get the nurse. The CNA left the room and never returned. No nurse or other staff member ever came to Mr. Rose's room to provide assistance, medical care, or emergency intervention.

44.     Mr. Rose spent the night struggling to breathe, alone, without medical intervention, after his direct plea for emergency care had been ignored.

45.     On the morning of January 20, 2025, at approximately 5:30 a.m., Mr. Rose's roommate discovered that Mr. Rose was unresponsive. The roommate notified the nursing staff of Mr. Rose's condition. Nursing staff found Mr. Rose without pulse or respirations. CPR was initiated at 5:25 a.m., but Mr. Rose did not respond to resuscitation efforts. Mr. Rose was pronounced dead at 6:05 a.m. on January 20, 2025.

46.     At approximately 6:30 a.m. on January 20, 2025, Stacy Curtis received a telephone call from University Park Nursing & Rehabilitation informing her that her brother had passed away.

47.     The death certificate for Billy Lee Rose, certified by Dr. Arif Mahmood on January 29, 2025, lists the following chain of events as the causes of death: (a) Immediate cause: Acute respiratory failure with hypoxia; (b) Due to (or as a consequence of): Sepsis with multi-organ failure; (c) Due to (or as a consequence of): Metabolic encephalopathy; (d) Due to (or as a consequence of); (e) Protein calorie malnutrition.

48.     During BILLY LEE ROSE's residence at University Park, Plaintiff relied on

Defendants' representations, and it was their belief and understanding that Mr. Rose was being properly cared for by all Defendants at all times. However, based upon Defendants' negligence and other tortious misconduct as alleged herein, BILLY LEE ROSE suffered substantial injury, pain, and suffering, and death for which Plaintiffs now seeks damages.

**<u>University Park's Profit from Understaffing and the Impact on Resident Care</u>**

37.    University Park gains much of its revenue and profit from taxpayer dollars by participating in federal and state-funded Medicare and Medicaid programs.

38.    In the Medicare/Medicaid system, every nursing home resident is assigned an "acuity" level which reflects the number and severity of that resident's medical conditions and illnesses.

39.    A resident with a higher acuity level places a greater demand for care and services on a nursing home and its staff.

40.    Skilled nursing facilities, like University Park, use acuity levels to bill Medicare/Medicaid for reimbursement of daily care and services.

41.    Medicare/Medicaid reimburses nursing facilities at a higher rate for care and services based on each resident's acuity rate and number of therapy minutes provided to that resident.

42.    Accordingly, the higher the facility's acuity levels, the more revenue the facility will generate from Medicare/Medicaid.

43.    This creates a financial incentive for nursing homes, such as University Park, to admit and keep residents with greater mental, physical, and psychological needs.

44.    Every year, skilled nursing facilities (including University Park) must submit a Medicare Cost Report to The Centers for Medicare and Medicaid Services ("CMS"), in which the facility must account for each dollar received and spent.

45.    A resident's acuity level is used by CMS to determine the number of hours the nursing home is expected to provide each day to meet resident needs.

46.    CMS then pays the facility according to the hourly rate of reimbursement for the expected number of nursing hours required for each resident.

47.    At the end of each fiscal quarter, the nursing home must provide CMS with an accounting of the hours it actually spent providing nursing care to residents.

48.    To calculate nursing hours, facilities, such as University Park, add up the hours spent providing care to residents by Registered Nurses ("RNs"), Licensed Practical Nurses ("LPNs"), and nursing aides.

49.    Throughout the entire period of Mr. Rose's residency, University Park failed to provide sufficient and expected licensed care to its residents (i.e., care provided by RNs and LPNs) or expected aide care to its residents.

50.    In 2021, 2022, 2023, and 2024, based on the acuity of its residents, University Park provided fewer nursing hours to residents than the anticipated minimum staffing promulgated by CMS.

51.    Managers, owners and operators of University Park knew the facility was understaffed yet made no corrections to their budgeting to allow for additional needed staff to provide care to Mr. Rose.

52.     As of November 11, 2025, University Park is rated 3-stars out of 5 overall by CMS, with a 2-star rating for staffing levels and with roughly 52 minutes less of nurse staff hours per resident per day compared to the national average. Furthermore, while the national average of RN hours per resident per day is 41 minutes and the Texas average is 26 minutes, University Park only provides 20 minutes of RN hours per resident per day per CMS data.[1]

53.     Generally, clinical studies have shown that understaffing in nursing homes has led to reductions in the quality of care provided to residents, such as Mr. Rose.[2]

54.     For example, a 2023 study[3] examined the impact of understaffing (or staffing "instability") on the quality of care that is provided in skilled nursing facilities, such as University Park.

55.     In particular, the study found elevated rates of understaffing of both LPNs and nursing aides (referred to as CNAs) is associated with worsened quality of care provided to residents.

56.     Specifically, the study found a statistically significant relationship between LPN/CNA understaffing and increased resident hospitalizations and emergency department visits.

57.     Skin breakdown, pressure wounds, and infections, like the ones Driskell suffered, are injuries which often require hospitalizations or emergency department visits.

---

[1] Information retrieved on November 19, 2025 from https://www.medicare.gov/care-compare/details/nursing-home/455916?id=c6dfdf44-22af-4bf4-9278-9cd843a3d27d&state=TX&measure=nursing-home-staffing

[2] Harrington C, Edelman TS. Failure to Meet Nurse Staffing Standards: A Litigation Case Study of a Large US Nursing Home Chain. INQUIRY: The Journal of Health Care Organization, Provision, and Financing. 2018;55. doi:10.1177/0046958018788686

[3] Mukamel DB, Saliba D, Ladd H, Konetzka RT. Association of Staffing Instability With Quality of Nursing Home Care. JAMA Netw Open. 2023;6(1):e2250389. doi:10.1001/jamanetworkopen.2022.50389.

58.     Mr. Rose required multiple emergency department visits and hospitalizations due to the poor care she received at University Park.

59.     Here, University Park provided below-average staffing to its residents, including Mr. Rose, thereby contributing to adverse patient outcomes to its residents, including Mr. Rose.[4]

60.     This below average staffing, per the literature analysis, leads to increased falls, malnutrition, and infections, and accordingly, at a minimum, increased the risk of Mr. Rose, a known pressure wound and infection risk, of developing injuries related to pressure wounds and infections.

## COUNT I
### Deprivation of Civil Rights Enforceable Via 42 U.S.C. §1983

61.     All of the preceding paragraphs of this Complaint are incorporated herein, as if set forth more fully at length.

62.     At all times relevant to this Complaint, University Park was acting under the color of state law and as an agent of the State of Texas.

63.     The Defendants are bound generally by the 1987 Omnibus Budget Reconciliation Act (OBRA) and the Federal Nursing Home Reform Act (FNHRA) which was contained within the 1987 OBRA. See: 42 U.S.C. §1396r. The Defendants are also bound generally by the OBRA/FNHRA implementing regulations found at 42 C.F.R. §483, et seq., which served to further define and amplify specific statutory rights set forth in the above-mentioned statutes.

---

[4] Discovery is needed to show how University Park's systematic understaffing specifically and individually impacted Mr. Rose. Despite the need for this information, it is a well-studied fact (and, indeed, a logical conclusion) that understaffing leads to inadequate care for residents, like Mr. Rose.

64.     The statutes in question, as amplified and further defined by the detailed regulatory provisions, create rights which are enforceable pursuant to 42 U.S.C. §1983 as decided by the United States Supreme Court in *Health and Hosp. Corp. of Marion Cty. v. Talevski*, 599 U.S. 166 (2023), as the language of these regulations and statutory provisions clearly and unambiguously creates those rights.

65.     The Defendants in derogation of the above statutes and regulations, and as a custom and policy, failed to comply with the aforementioned regulations as follows:

a.      By failing, as a custom and policy, to provide services with reasonable accommodations of the individual needs and preferences of residents, such as BILLY LEE ROSE, as required by 42 U.S.C. §1396r(c)(1)(A)(v)(I);

b.      By failing, as a custom and policy, to allow patients such as BILLY LEE ROSE to be to be fully informed in advance about care and treatment, to be fully informed in advance of any changes in care or treatment that may affect the resident's well-being, and to participate in planning care and treatment or changes in care and treatment as required by 42 U.S.C. §1396r(c)(1)(A)(i);

c.      By failing, as a custom and policy, to care for patients, including BILLY LEE ROSE, in a manner that promoted maintenance or enhancement of her life, as required by 42 C.F.R. § 483.10, 42 C.F.R. § 483.24, 42 U.S.C. § 1396r(c)(1)(A)(xi), and 42 U.S.C. § 1396r(b)(1)(A), as pled herein;

d.      By failing, as a custom and policy, to provide residents, including BILLY LEE ROSE, the necessary care and services to allow her to attain or maintain the highest practicable physical, mental, and psycho-social wellbeing, as required by 42 C.F.R. § 483.24 and 42 U.S.C. § 1396r(b)(3)(A);

e.      By failing, as a custom and policy, to periodically review and revise patients' or residents' written Care Plans, including BILLY LEE ROSE, by an interdisciplinary team after each of the resident's or patient's assessments,

as described by 42 U.S.C. § 1396r(b)(3)(A), as required by 42 U.S.C. § 1396r(b)(2)(C);

f.  By failing, as a custom and policy, to conduct an assessment of  patients or residents, including BILLY LEE ROSE, as required by 42 U.S.C. § 1396r(b)(3)(A), promptly after a significant change in the resident's physical or mental condition, as required by 42 U.S.C. § 1396r(b)(3)(C)(i)(II);

g.  By failing, as a custom and policy, to use the results of the assessments required as described above in developing, reviewing and revising patients' or residents', including BILLY LEE ROSE's Care Plan, as required by 42 U.S.C. § 1396r(b)(3)(D);

h.  By failing, as a custom and policy, to ensure that patients and/or residents, including BILLY LEE ROSE, were provided medically related social services to attain or maintain the highest practicable physical, mental, and psycho-social wellbeing, as required by 42 C.F.R. § 483.24 and 42 U.S.C. § 1396r(b)(4)(A)(ii);

i.  By failing, as a custom and policy, to ensure that the personnel responsible for the care of residents, including BILLY LEE ROSE, was properly certified and/or re-certified as being qualified to perform necessary nursing services, as required by 42 U.S.C. § 1396r(b)(4)(B);

j.  By failing, as a custom and policy, to provide sufficient nursing staff to provide nursing and related services that would allow patients or residents, including BILLY LEE ROSE, to attain or maintain the highest practicable physical, mental and psycho-social well-being, as required by 42 C.F.R. § 483.35 and 42 U.S.C. § 1396r(b)(4)(C);

k.  By failing, as a custom and policy, to ensure that University Park was administered in a manner that enabled it to use its resources effectively and efficiently to allow patients or residents, including BILLY LEE ROSE, to attain or maintain their highest practicable level of physical, mental, and psycho-social wellbeing, as required by 42 C.F.R. § 483.70, 42 U.S.C. § 1396r(d)(A), 42 U.S.C. § 1396r(d)(1)(A), and 42 U.S.C. § 1396r(d)(1)(C);

l.    By failing, as a custom and policy, to ensure that the administrator of University Park met the standards established under 42 U.S.C. § 1396r(f)(4), as required by 42 U.S.C. § 1396r(d)(1)(C);

m.    By failing, as a custom and policy, to develop, implement, and maintain an effective training program for all new and existing staff, contractors, and volunteers, consistent with the individual's expected roles, as required by 42 C.F.R § 483.75 and 42 U.S.C. § 1396r(f)(2)(A)(i), as pled herein;

n.    By failing, as a custom and policy, to develop and implement written policies and procedures that prohibit the mistreatment, deliberate indifference, and abuse of residents such as BILLY LEE ROSE, as required by 42 C.F.R. § 483.12 and 42 U.S.C. § 1396r(b)(1)(A);

o.    By failing, as a custom and policy, to provide nursing staff who are adequately trained and competent to provide nursing and related services to assure the safety and wellbeing of residents, including BILLY LEE ROSE, as required by 42 C.F.R § 483.35, as pled herein;

p.    By failing, as a custom and policy, to ensure that University Park was complying with the federal, state, local laws and accepted professional standards which apply to professionals providing services to residents, including BILLY LEE ROSE, and in operating such a facility as University Park, as required by 42 U.S.C. § 1396r(d)(4)(A); and

q.    By failing, as a custom and policy, to ensure that University Park's administrator and director of nursing properly monitored and supervised subordinate staff, thereby failing to ensure the health and safety of residents or patients, including BILLY LEE ROSE, in derogation of 42 C.F.R. § 483.75 and 42 U.S.C. § 1396r(b)(B).

66.    As a proximate result of Defendants' actionable derogation of its regulatory and statutory responsibilities as above-described, BILLY LEE ROSE was injured as previously referenced, and suffered pain and distress as a result of University Park's poor care and treatment, which allowed her to suffer harm as described herein. As such, BILLY LEE ROSE has suffered, and is entitled to recover the following damages, as well as an award of reasonable

counsel fees, pursuant to 42 U.S.C. §1983 and 42 U.S.C. §1988:

      a.      Pain, suffering, inconvenience, anxiety and nervousness of BILLY LEE ROSE;

      b.      Hospital, medical, and nursing expenses incurred for BILLY LEE ROSE's care and treatment;

      c.      Other losses and damages permitted by law; and,

      d.      Any other damages as the Court sees fit to award.

WHEREFORE, the Plaintiff, STACY CURTIS, individually and on behalf of BILLY LEE ROSE, demands damages of the Defendants WEST WHARTON COUNTY HOSPITAL DISTRICT d/b/a UNIVERSITY PARK; Seventy-Five Thousand Dollars ($75,000.00), plus interest, costs of suit and attorneys' fees.

**A JURY TRIAL IS DEMANDED.**

Respectfully submitted,

**SMITH CLINESMITH LLP**

BY: */s/Constance Mutong*
Constance Mutong
State Bar No. 24104765
Jacob Runyon
State Bar No. 24083771
325 N. St. Paul Street, Suite 2775
Dallas, TX 75201
214-953-1900 Telephone
214-953-1901 Facsimile
txservice@fightingelderabuse.com
***ATTORNEYS FOR PLAINTIFF***